**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DAVID P. EGGLESTON,               )
                                  )
                  Plaintiff,      )          Civil Action 05-84 Erie
        v.                        )
                                  )
JO ANNE B. BARNHART,              )
COMMISSIONER OF SOCIAL            )
SECURITY,                         )
                  Defendant.      )

_____

### MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District J.,

        In this case, Plaintiff, David P. Eggleston seeks judicial review, pursuant to 42

U.S.C. §§ 405(g) and 1383(c)(3), of the final decision of the Commissioner of Social

Security denying his claims for disability insurance benefits ("DIB") and supplemental

security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C.

§§ 401 *et seq,* and §§ 1381 *et seq.*  Plaintiff filed applications for DIB and SSI on

November 3, 2002, alleging disability as of August 14, 2000 due to diabetes, high blood

pressure, and depression.  (R. 76-78, 86, 191-92.)  Plaintiff's applications were denied

in a state agency decision dated April 15, 2003.  (R. 60-63.)  At Plaintiff's request, an

Administrative Law Judge (ALJ) held a hearing on January 15, 2004, during which time

testimony was received from Plaintiff and a vocational expert.  (R. 33-57.)  On March 5,

2004 the ALJ rendered an adverse decision, finding that Plaintiff is not "disabled" within

the meaning of the Social Security Act.  (R. 19-26)  Upon the Appeals Council's denial

of further review (R. 8-10), the ALJ's decision became the "final decision" of the

Commissioner.  Plaintiff then commenced this action on March 15, 2005.

        Presently pending before this Court are cross-motions for summary judgment

filed by Plaintiff and the Commissioner.  For the reasons that follow, we will deny both

motions and remand this case for further administrative proceedings.

## I. BACKGROUND

Plaintiff was forty-three years old at the time of the ALJ's adverse decision.  He has a GED and no transferable work skills.  Prior to the onset of his alleged disability, he was employed as a general laborer for a lumbar company.  (R. 37-38, 43-44, 79-81.)  He was discharged from his job in 2001 after testing positive for marijuana and has not worked since that time.  (R. 44.)  His treatment records reflect a history of diabetes, hypertension, carpal tunnel syndrome, alcoholism, and depression.  Most relevant for purposes of this appeal, however, is the evidence concerning Plaintiff's depression.

On February 13, 2003, Plaintiff underwent a clinical psychological disability evaluation by Martin Meyer, Ph.D.  (R. 131-38.)  At the time of his evaluation, Plaintiff reported experiencing mood swings about twice a week along with moderate to severe depression that is "near constant."  He acknowledged that loss of financial capability, health problems, and sexual problems were triggering factors for his lachrymosity and social isolation.  He admitted to frequent suicidal ideation and mild and occasional anxiety relative to concerns about his finances.  His thought assembly was confused and he complained of short-term memory problems.  Plaintiff also reported having an extremely erratic appetite, very limited social interaction, infrequent episodes of intense anger, easy loss of concentration and difficulty sleeping.  Although he had not been hospitalized for psychiatric evaluation, he had reportedly been receiving mental health counseling with a therapist once per month relative to alcohol and depression.  At the time of his evaluation, Plaintiff had been taking Zyprexa and Lexapro and indicated that he felt those drugs helped him "quite a bit."  Nevertheless, Plaintiff reported a poor emotional status, noting that he had no money and depended on his wheelchair-bound brother for everything.  (R. 132.)

Dr. Meyer's mental status exam indicates that Plaintiff appeared disheveled and unkempt and failed to make eye contact during the interview.  He was cooperative about discussing his personal history and displayed no abnormal body movements.  His speech was mumbled and somewhat rambling and he displayed apathy and lethargy in

2

his affect.  However, Dr. Meyer found no evidence of disturbed thought process or neural sensory distortion; rather, Plaintiff's thought process was normal and relevant and he showed coherent use of language.  There was no blocking in expression of thought, tangential thinking, flight of ideas, or loosening of associations.  Response latency was felt to be adequate.  It was noted that Plaintiff admitted to suicidal ideation and displayed excessive rumination about his family.  He tended to obsess about his worries and displayed somatic preoccupation.  His statements tended to reflect feelings of low self-esteem and worthlessness.  There was no indication of a delusional thought process and Dr. Meyer felt that Plaintiff likely had average intelligence and adequate learning abilities.  His fund of vocabulary knowledge was considered adequate.  Plaintiff reported attention problems and could not perform serial subtraction.  He was fully alert and oriented to time, place, person, and date.  Although Plaintiff was reportedly forgetful in the location or placement of objects, he was able to adequately recall childhood experiences, recent events, and meaningful events occurring within the past few months.  He could recall seven digits forward and three digits backward.  It was noted that Plaintiff had difficulties with impulse control, as evidenced by his substance abuse, suicidal tendencies, and eating disturbances.  With respect to social judgment, Dr. Meyer felt that Plaintiff showed "difficulty attributing meaning to the events of the external environment in terms of appropriate behaviors and understanding the outcome of their own behavior."  (R. 134.)  It was felt that Plaintiff's test judgment was appropriate for his age, mental abilities and experiences.  On the other hand, Dr. Meyer felt that Plaintiff's capacity to gain insight or learn from experience was poor.  Dr. Meyer's diagnosis was as follows:  AXIS 1:  Adjustment Disorder with mixed Anxiety and Depressed Mood, Cannabis Abuse, Nicotine Dependence; AXIS 2:  No Diagnosis; AXIS III:  Diabetes, hypertension, visual acuity; AXIS IV:  Significant Stressors:  Occupational problems; AXIS V:  GAF = 55-60.  Dr. Meyer assigned Plaintiff a fair prognosis in terms of higher level functioning and personality integration.  (R. 134.)

3

Dr. Meyer next rated Plaintiff's abilities in various functional domains.  (R. 135-36.)  Dr. Meyer felt that Plaintiff generally functioned "OK" in his activities of daily living, with the exception of grooming and hygiene, where Plaintiff "lacked motivation."  (R. 135.)  In terms of social functioning, Dr. Meyer felt that Plaintiff was "fair" in his ability to get along with others, in his social maturity, and in his ability to interact with members of the public.  Dr. Meyer rated Plaintiff as "OK" in dealing with authority figures, co-workers and peers.  With respect to concentration and task persistence, Dr. Meyer rated Plaintiff as "OK" in task completion and keeping to a schedule but he noted that, in terms of maintaining a consistent pace, Plaintiff "fatigues easily."  In addition, Dr. Meyer felt Plaintiff could handle only simple instructions and simple routines.  (R. 136.)  In terms of making occupational adjustments, Dr. Meyer felt that Plaintiff had a "fair" ability to deal with the public, use judgment, cope with work stresses, function independently, and maintain attention and concentration.  He rate Plaintiff as "good" with respect to following work rules, relating to co-workers and interacting with supervisors.  (R. 137.)  As for understanding, remembering and carrying out job instructions, Dr. Meyer found that Plaintiff had no useful ability in these areas when job instructions were complex and only fair ability when the job instructions were detailed (but not complex).  On the other hand, Dr. Meyer felt that Plaintiff had good ability to understand, remember and carry out simple job instructions.  (R. 137.)  Finally, with respect to making personal/social adjustments, Dr. Meyer rated Plaintiff only "fair" in his ability to maintain his personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability.  (R. 138.)

Beginning in July of 2003, Plaintiff sought treatment from Jennifer Pasternak, M.D., PhD at Stairways Behavioral Health.  At his initial visit on July 3, 2003, Plaintiff exhibited a dysphoric and constricted affect.  Dr. Pasternak noted that Plaintiff appeared distracted but it was not clear that he was "frankly disorganized."  Although he had difficultly articulating his symptoms, Dr. Pasternak was not convinced that this was actually psychotic disorganization.  Dr. Pasternak assessed major depression,

4

dysthymia, generalized anxiety disorder, alcohol and marijuana dependence in remission, rule out Psychotic Disorder NOS.  She continued Plaintiff on Seroquel to help him sleep and proscribed a trial of Zoloft.  (R. 184.)

On July 30, 2003, Plaintiff reported to Dr. Pasternak that he was still very frustrated by the extent of his depression and had been unable to tolerate the Zoloft that she prescribed.  He could not identify much in life that would be enjoyable or that would make him feel better.  He did not make much eye contact but did appear engaged during his mental status exam.  He displayed significant negative cognitive distortions but showed no evidence of psychosis other than perseveration in his speech, which Dr. Pasternak felt might be mild disorganization.  Dr. Pasternak increased Plaintiff's Seroquel dosage in an effort to increase the organization of his thinking and improve his sleep.  She planned to take him off Zoloft and restart him on Lexapro based on his representation that he had felt much better on Lexapro.  (R. 183.)

Progress notes from August 29, 2003 indicate that Plaintiff was reportedly doing better and was tolerating the Lexapro without difficulty.  Dr. Pasternak noted that he appeared much less distracted and better organized.  His speech was coherent, but he was preoccupied on that day with pain from an abscessed tooth.  His affect continued to be dysphoric and constrictive, but he had no suicidal ideations.  Plaintiff was continued on his medication regimen and was advised to continue with individual therapy and attendance at the "mood and motivation group."  (R. 182.)

On November 20, 2003, Plaintiff reported that he was feeling a little bit better, but he still did not feel like doing anything.  He was feeling more lonely and alone since his brother was spending a lot of time with his girlfriend.  Although Plaintiff could not identify much that he would like to do, he indicated definitely feeling less depressed.  He was concerned about his fluctuating sugar levels and his tooth abscess.  On mental status exam, Plaintiff's speech was moderately pressured but coherent.  His affect, though less dysphoric, was still constricted.  He had no suicidal ideations.  Dr. Pasternak assessed major depression with some improvement, dysthymia, generalized

5

anxiety disorder, alcohol and marijuana dependence in remission.  She planned to
increase Plaintiff's Lexapro to see whether the higher dose would target his depressive
symptoms and motivate him more effectively.  She continued him on daily dosages of
Seroquel and strongly encouraged Plaintiff to participate in the mood and motivation
group, which she felt would give him the additional support and social interaction that
he was missing.  (R. 181.)

On January 14, 2004, Dr. Pasternak completed a "Medical Source Statement of
[Plaintiff's] Ability to Do Work-Related Activities" in light of his mental impairments.  (R.
185-86.)  Dr. Pasternak indicated that Plaintiff's ability to understand, remember and
carry out instructions were affected by his poor concentration and lower energy level.
She found that he suffered from "extreme" limitations in understanding, remembering,
and carrying out detailed instructions.  When the instructions were short and simple, his
limitations in those areas were "marked."  She also found that he had marked limitation
in his ability to make judgments on simple work-related decisions.  (R. 185.)  Dr.
Pasternak further indicated limitations in Plaintiff's ability to respond appropriately to
supervision, co-workers, and pressures in a work setting.  She found extreme limitation
in Plaintiff's ability to respond appropriately to work pressures in a usual setting.  She
felt that Plaintiff possessed marked limitations in his ability to interact appropriately with
the public, supervisors, and co-workers.  Plaintiff's ability to respond appropriately to
changes in a routine work setting was also felt to be markedly limited.  In support of
these findings, Dr. Pasternak cited Plaintiff's inability to tolerate stress, noting that he
"becomes profoundly depressed and immobilized.  Under significant stress can become
disorganized."  (R. 186.)  Dr. Pasternak felt that Plaintiff could not manage benefits in
his own best interest.  (Id.)

Also included in the record is a review completed on March 31, 2003, by Edward
Zuckerman, PhD, an expert for the state agency.  Dr. Zuckerman opined that Plaintiff
would be moderately limited in terms of his ability to carry out detailed instructions and
maintain attention and concentration for extended periods.  (R. 139.)  Dr. Zuckerman

6

also felt Plaintiff was moderately limited in his ability to respond appropriately to changes in a work setting and in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 140.)  In all other respects, Dr. Zuckerman opined that Plaintiff would not be significantly limited in the domains of understanding and memory, sustained concentration and persistence, social interaction and adaptation.  (R. 139-40.)

## II.  STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).  Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971).  It has been defined as less than a preponderance of evidence but more than a mere scintilla.  *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III.  DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Administration has established a five-step evaluation process to determine when an individual meets this definition:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work. If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform. The claimant bears the burden of proof for steps one, two, and four of this test. The Commissioner bears the burden of proof for the last step.

Allen v. Barnhart, 417 F.3d 396, 401 n. 2 (3d Cir. 2005) (citing 20 C.F.R. § 404.15120 (1999) (internal citations omitted)).

In this case, the ALJ resolved the Plaintiff's claim at the fifth step. In relevant part, the ALJ determined that Plaintiff suffers from diabetes, depression, and anxiety, which – although "severe" within the meaning of the Act – are not presumptively disabling under the Commissioner's regulations. The ALJ further found that Plaintiff's allegations regarding his own limitations were not totally credible and that Plaintiff possesses the residual functional capacity ("RFC") to perform a significant range of work at the light exertional level, *i.e.* "work involving no more than simple, routine repetitious tasks, with one- or two-step instructions, performed in a low-stress environment, defined as work requiring few decisions; or more than occasional contact with the public and co-workers." (R. 25, finding 6.) Based on testimony from a vocational expert, the ALJ found that Plaintiff's residual functional capacity permits him to engage in a significant number of jobs existing in the national economy, including work as a janitor/cleaner or as a packager. The ALJ therefore concluded that Plaintiff is not "disabled" within the meaning of the Social Security Act.

In this appeal, Plaintiff primarily challenges those portions of the ALJ's analysis and ruling which concern his mental impairments. He contends, in essence, that his mental limitations preclude him from working and that the ALJ's conclusion to the contrary is unsupported by substantial evidence. Plaintiff's chief criticism stems from the ALJ's alleged refusal to accord proper weight to Dr. Pasternak's medical opinion. We agree that the ALJ's analysis in this regard is fundamentally flawed such that the Commissioner's adverse ruling is not supported by substantial evidence in the record.

The Third Circuit and the Commissioner have established specific rules relative to consideration of a treating source's medical opinion:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer*, 186 F.3d at 429 (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir.1994); *Jones*, 954 F.2d at 128; *Allen v. Bowen*, 881 F.2d 37, 40-41 (3d Cir.1989); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Brewster*, 786 F.2d at 585. Where ... the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Plummer*, 186 F.3d at 429 (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)). The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. *See Adorno*, 40 F.3d at 48. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Kent,* 710 F.2d at 115.

Morales v. Apfel, 225 F.3d 310, 317-18 (3d Cir. 2000).

In this case, the ALJ declined to give Dr. Pasternak's opinion controlling weight because the ALJ felt it was: (i) not supported by Dr. Pasternak's treatment records, (ii) inconsistent with the Plaintiff's daily activities, and (iii) inconsistent with the medical opinion of Dr. Meyer. Instead, the ALJ credited Dr. Meyer's medical assessment on the grounds that Dr. Meyer's opinion was supported by his own findings, by evidence of the Plaintiff's daily activities, and by the opinion of the state agency expert. Plaintiff contends, and we agree, that the ALJ's analysis is unsupportable to the extent he found

Dr. Meyer's opinion consistent with the state agency expert and materially inconsistent with Dr. Pasternak's assessment.

We begin by noting that Dr. Meyer's medical assessment of Plaintiff's ability to do work-related activities required him to rate Plaintiff in several subcategories supposedly reflective of Plaintiff's ability to make occupational, performance, and personal/social adjustments, among other things.  As Plaintiff observes (and the Commissioner does not seem to dispute), it appears that Dr. Meyer partly completed his assessment on a standard agency form (Form H56993 CEMD) sent to him by the Commonwealth Bureau of Disability Determination.  This form required Dr. Meyer to rate Plaintiff's abilities as being either "unlimited or very good," "good," "fair" or "poor or none" in each of the relevant subcategories.  (See R. 137-38.) Although only pages 6 and 7 of the form were submitted by Dr. Meyer, Plaintiff points out that page 5 of the standardized form defines the rating system as follows[1]:

> Unlimited or Very Good - Ability to function in this area is more than satisfactory.
>
> Good - Ability to function in this area is limited but satisfactory.
>
> Fair - Ability to function in this area is seriously limited, but not precluded.
>
> Poor or None - No useful ability to function in this area.

(See Pl.'s Br. in Supp. of Mot. for Summ. Judg. [Doc. 8] at Attachment A, p. 5.)

Significantly, Dr. Meyer rated Plaintiff as only "fair," – i.e., displaying "serious limitation" – in ten out of fifteen categories indicated on Form H56993 CEMD.  Many of

---

[1] Plaintiff has appended to his brief a sample copy of the 7-page medical assessment form generated by the state Bureau of Disability Determination.  (See Attachment A to Pl.'s Br. in Supp. of Pl.'s Mot. for Summ. Judg. [Doc. 8].)  Pages 6 and 7 of this sample form appear to be identical to the form submitted by Dr. Meyer.  The relevant definitions explaining the rating system appear on page 5 of the form, which is not included within the administrative record.  However, Plaintiff presumes (and the Commissioner has not disputed) that the same form, in its entirety, would have been mailed by the state agency to Dr. Meyer and, therefore, Dr. Meyer would have had the benefit of the page 5 definitions in making his assessment.

these "fair" ratings are consistent with (or, at least, not inconsistent with) Dr. Pasternak's findings that Plaintiff's ability to function in certain areas is "markedly" limited – i.e. "seriously" or "severely" limited, although not completely precluded. (See R. 185.) For example, both Dr. Meyer and Dr. Pasternak felt that Plaintiff had serious limitations in dealing with the public. Both evaluators found Plaintiff to be serious limited in his use of judgment. Dr. Meyer's finding that Plaintiff would have serious limitations in his ability to behave in an emotionally stable manner, relate predictably, and demonstrate reliability correspond loosely with Dr. Pasternak's finding that Plaintiff has marked limitations in his ability to respond appropriately to changes in a routine work setting. (R. 137-38.) Dr. Meyer also indicated a "fair" rating – i.e., serious limitations – in Plaintiff's ability to function independently, maintain attention and concentration, maintain his personal appearance, and deal with work stresses.

Plaintiff points out that, under the definition section of Form H56993 CEMD, a "fair" rating by Dr. Meyer suggests a level of performance that is less than satisfactory.[2] Thus, these "fair" ratings by Dr. Meyer are significant in assessing Plaintiff's residual functional capacity because, as the Administration's own regulations make clear:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (*on a sustained basis*) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. *A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base*. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

---

[2] Plaintiff infers that, if a "good" rating means that the claimant's ability to function is "limited but satisfactory," and if a "poor/none" rating means that the claimant has "no useful ability to function," then a "fair" rating must indicate some level of ability that is less than satisfactory. The Commissioner does not dispute this inference, nor do we find any logical basis for doing so.

11

Social Security Ruling 85-15, 1985 WL 56857 at *4 (1985) (emphasis supplied).  While it remains a possibility that the ALJ construed Dr. Meyer's "fair" ratings under a definition different from the one supplied on the standardized form, the record provides no evidence or guidance in this regard, nor does it suggest any rationale on the ALJ's part for doing so.

In support of his conclusion that Dr. Pasternak's opinion was inconsistent with that of Dr. Meyer, the ALJ cited the fact that Dr. Meyer found Plaintiff's thought process to be in tact, whereas Dr. Pasternak found evidence of disorganization. The ALJ also noted that Dr. Meyer rated Plaintiff's ability to deal with simple job instructions as "good," whereas Dr. Pasternak indicated marked limitations in this area.  However, these discrepancies alone do not translate into fundamentally inconsistent medical opinions, especially when one considers the various areas in which Dr. Meyer rated Plaintiff's ability as only fair, i.e. less than satisfactory.[3]

As further support for his rejection of Dr. Pasternak's findings, the ALJ reasoned that Dr. Meyer's evaluation (in contrast, apparently, to Dr. Pasternak's) was "consistent with his findings and with the claimant's daily activities."  However, the ALJ provided no analysis or reasoning as to how or why he felt Dr. Meyer's evaluation was more internally consistent than Dr. Pasternak's.  Furthermore, while it is true that Dr. Meyer rated Plaintiff favorably (i.e. "ok") in most activities of daily living (see R. 135), it does not follow that Dr. Meyer's opinion materially contradicted Dr. Pasternak in this regard. Dr. Pasternak did not formally assess Plaintiff's abilities to engage in activities of daily living.  Perhaps more significant, a claimant's ability to function in activities of daily living does not necessarily translate into an ability to work.  See Smith v. Califano, 637 F.2d

---

[3] We note that part of the difficulty in being able to meaningfully analyze medical evidence stems from the fact that, as in this case, physicians and psychologists often use differing forms in rating a claimant's residual functional abilities.  It would seem that both the Administration and the courts would be greatly assisted in their review of medical evidence if the same forms were used consistently among different evaluators.

12

968, 971-72 (3d Cir. 1981) (sporadic or transitory activity does not disprove disability). As our circuit court of appeals has reminded us, for the mentally impaired, "the work environment is completely different from home or a mental health clinic." Morales v. Apfel, 225 F.3d 310, 319 (3d Cir. 2000).

Nor is it as evident as the ALJ suggested that Dr. Meyer's conclusions are consistent with the conclusions of Dr. Zuckerman, the state agency expert.  It does appear that both Dr. Meyer and Dr. Zuckerman rated Plaintiff favorably in terms of his ability to understand, remember and carry out simple job instructions, his ability to maintain a schedule, and his ability to deal with authority figures and co-workers. However, Dr. Meyer felt Plaintiff had only fair ability (i.e., less than satisfactory ability) to deal with the public and "get along with others," to use judgment, to function independently, to maintain attention and concentration, to maintain personal appearance, and to behave in an emotionally stable manner.  These findings contradict Dr. Zuckerman's opinion that Plaintiff had no significant limitations or, at most, only moderate limitations, in these areas.  The ALJ reasoned that the opinion of the state agency expert was entitled to significant weight under SSR 96-6p because it was "consistent with the objective medical evidence."  (R. 23.)  However, the ALJ's reasoning in this regard consists of no more than a blanket assertion without any further evaluation or analysis.  (And, as Plaintiff points out, the state agency expert did not have the benefit of Dr. Pasternak's treatment notes or functional assessment at the time he rendered his opinion.)

The foregoing problems would be a sufficient basis, in this Court's view, for vacating the Commissioner's final decision; however, we find that a few additional comments are pertinent.  We note that the ALJ discounted Dr. Pasternak's medical assessment partly on the theory that she supposedly failed to cite specific limitations or her treatment notes in support of her functional assessment.  However, a review of Dr. Pasternak's functional assessment shows that she specifically cited Plaintiff's poor concentration and decreased energy level as findings supporting her opinion that

Plaintiff had impaired ability to understand, remember, and carry out instructions.  (R. 185.)  In support of her conclusion that Plaintiff has impaired ability to respond appropriately to supervision/co-workers and work pressures in a work setting, Dr. Pasternak noted that Plaintiff is "'unable to tolerate stress- becomes profoundly depressed and immobilized.  Under significant stress can become disorganized." (R. 186.)[4]  Thus, the record belies the ALJ's assertion that Dr. Pasternak failed to cite any specific limitations in support of her medical assessment.  Moreover, Dr. Pasternak's failure to specifically cite her treatment records does not necessarily undermine the validity of her opinion.  As Plaintiff points out, a medical source's treatment notes necessarily reflect the provider's assessment of the patient's progress at a given point in time, whereas the medical source statement completed by Dr. Pasternak in January 2004 asked Dr. Pasternak to evaluate Plaintiff's "ability to do work-related activities *on a sustained basis*."  (R. 185 (emphasis supplied).)  The factors cited by Dr. Pasternak in support of her January 2004 evaluation – Plaintiff's poor concentration, low energy, and inability to tolerate stress – are not necessarily inconsistent with her diagnosis or the observations she recorded in her treatment notes.

The ALJ also cited the fact that Dr. Pasternak's treatment notes did not record hospitalizations or other episodes of decompensation that would illustrate, to the ALJ's satisfaction, the disabling impact of Plaintiff's stress.  However, the Plaintiff need not have experienced extreme episodes of decompensation in order to be considered "disabled."  See Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of

---

[4] Interestingly, Dr. Meyer's medical assessment of Plaintiff's ability to do work-related activities required him to rate Plaintiff's abilities to make occupational, performance and personal/social adjustments and further instructed him to "[d]escribe any limitations and include the medical/clinical findings that support this assessment." (R. 137-38.)  The ALJ purported to credit Dr. Meyer's findings, notwithstanding the fact that the areas on the form calling for a description of limitations and/or medical/clinical findings is left blank.  (Id.)

human and social activity.").  Furthermore, under the circumstances of this case, it is
not surprising that the record is devoid of episodes of Plaintiff's decompensation in a
work-like setting.  That is because the evidence in this case suggests that the Plaintiff's
depression became more severe after (and perhaps, because of) the termination of his
employment and, since that time, he has led a life marked by social isolation and
removed from the realities of a work-like setting.  In fact, Dr. Meyer, whom the ALJ
purports to credit, suggests in his report that Plaintiff's lack of employment and resulting
dire financial circumstances are among the factors triggering Plaintiff's depression and
anxiety.  Dr. Meyer notes, for example, that Plaintiff's "[d]epressive episodes initiated in
August, 2001 with loss of employment and have been moderate to severe and near
constant.  The claimant indicates lachrymosity and isolation from others with
circumstantial triggers involving loss of financial capability, health problems, and sexual
problems."  (R. 132.)  (See also id.("Anxiety is mild and occasional with worries of
finances.  Obsessive thoughts involved the latter as well as general rumination."))  Dr.
Meyer's Axis IV diagnosis indicates that Plaintiff's "occupational problems" are a
significant stressor.  (R. 134.)

    All of the foregoing observations lead us to conclude that the ALJ misconstrued
the evidence and/or viewed it selectively, in deciding to discount Dr. Pasternak's
findings.  Thus, we cannot say that the ALJ's hypothetical to the vocational expert
incorporates all material limitations as reflected in the record.

    In addition, however, we note our agreement with Plaintiff's argument that the
ALJ engaged in speculation to the extent that he determined Plaintiff's limitations in
dealing with stress would be adequately accommodated by jobs requiring "few
decisions."  (See ALJ's RFC finding no. 6, R. 25.)  For one, it should be reiterated that
Dr. Meyer, whom the ALJ purported to credit, indicated that Plaintiff has only "fair"
ability to deal with work stresses, which (as we've seen) apparently translates into
serious limitations and less-than-satisfactory ability.  More to the point, however, it is by
no means clear that job-related stress is defined principally by the number of decisions

15

that an individual must make on the job.  As the Administration itself has observed, for

the mentally impaired, the very requirement of breaking a highly rigid routine or lifestyle

may produce stress:

> Individuals with mental disorders often adopt a highly restricted and/or inflexible lifestyle within which they appear to function well. ...The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. A person may become panicked and develop palpitations, shortness of breath, or feel faint while riding in an elevator; another may experience terror and begin to hallucinate when approached by a stranger asking a question. Thus, the mentally impaired may have difficulty meeting the requirements of even so-called "low-stress" jobs.
>
> Because the response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job. for example, a busboy need only clear dishes from tables. But an individual with a severe mental disorder may find unmanageable the demands of making sure that he removes all the dishes, does not drop them, and gets the table cleared promptly for the waiter or waitress. Similarly, an individual who cannot tolerate being supervised may not be able to work even in the absence of close supervision; the knowledge that one's work is being judged and evaluated, even when the supervision is remote or indirect, can be intolerable for some mentally impaired persons. *Any impairment-related limitations created by an individual's response to demands of work, however, must be reflected in the RFC assessment.*

SSR 85-15 (emphasis supplied).

Because of the deficiencies in the ALJ's analysis, this Court is not satisfied that

all of Plaintiff's relevant impairment-related limitations were adequately reflected in the

ALJ's hypothetical question to the vocational expert.  Accordingly, we cannot say that

the ALJ's adverse ruling is supported by substantial evidence.  See Ramirez v.

Barnhart, 372 F.3d 546, 550 (3d Cir. 2004) ("If ... an ALJ poses a hypothetical question

to a vocational expert that fails to reflect 'all of the claimant's impairments that are

supported by the record(,) ... it cannot be considered substantial evidence.'") (quoting
<u>Chrupcala v. Heckler</u>, 829 F.2d 1269, 1276 (3d Cir. 1987)).

### IV.  CONCLUSION

Based upon the foregoing reasons, we will vacate the Commissioner's final
decision and remand the matter for further administrative proceedings consistent with
this memorandum opinion.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DAVID P. EGGLESTON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action 05-84 Erie |
| v. | ) | |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| Defendant. | ) | |

## O R D E R

AND NOW, *to wit*, this 30th day of September, 2005, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's motion [Doc. No. 7] for summary judgment is DENIED and the Defendant's motion [Doc. No. 9] for summary judgment is DENIED.

IT IS FURTHER ORDERED that the final decision of the Commissioner in the above-captioned matter is hereby VACATED and the matter is REMANDED for further administrative proceedings consistent with this Memorandum Opinion and Order.

s/   Sean J. McLaughlin
United States District Judge

cm:   All counsel of record.

18